UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| MAHER ARIF, BRAD ELLISH, BATMADAKH CHOIJIN and DAGVADOR BAYARSAIHAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | **4:24-CV-04044-LLP**<br><br>OPINION AND ORDER GRANTING MOTION FOR LEAVE TO SUPPLEMENT THE RECORD, GRANTING MOTION TO COMPEL, STAYING PROCEEDINGS, AND DENYING MOTION TO DISMISS |

This case relates to a practice Wells Fargo followed until February 22, 2023: charging Deposit Item Return Unpaid Fees to consumer accountholders. (Exh. H to Ward Decl., Doc. 23-8; Ward Decl., Doc. 23 ¶ 5). There is no dispute in this case that the four Plaintiffs are accountholders at Wells Fargo, two holding individual accounts – Ellish and Arif – and two as joint accountholders on the same account – Choijin and Bayarsaihan.[1] (Ellish Decl., Doc. 26 ¶ 4; Arif Decl., Doc. 27 ¶ 4; Choijin Decl., Doc. 28 ¶ 4; Bayarsaihan Decl., Doc. 29 ¶ 4; Ward Decl., Doc. 23 ¶¶ 8, 11-14.)

There is no dispute that Wells Fargo charged each of the three accounts at issue a "Deposited Item Return Unpaid" fee of $12. (Ward Decl., Doc. 23 ¶¶ 9,12,15; Complaint, Doc. 1, ¶¶ 38, 43, 51.) In each case, the fee was charged in connection with the respective Plaintiff's effort to deposit a check into the relevant account at a time when the issuer of the check did not

---

[1] The docket, pleadings and exhibits refer to the plaintiff joint accountholders in various inconsistent ways: Batmadakh Choijin or Batmandakh Choijin and Bayarsaihan Dagvadorj, Dagvadorj Bayarsaiham, or Dagvador Bayarsaihan. This opinion follows the spelling and pronouns used or implied in the Declarations of those individuals or confirmed by their counsel at oral argument: Ms. Dagvadorj Bayarsaihan and Mr. Batmadakh Choijin. (Doc. 28; Doc. 29; Oral Argument at 12:57:19-12:57:34).

have sufficient funds to cover the deposit. In other words, the checks that Plaintiffs sought to deposit "bounced." To be clear, in this case, Plaintiffs did not *write* checks that bounced; rather, they *received* checks that bounced. (Complaint, Doc. 1 ¶¶ 2-3,17.) Their efforts to deposit those checks resulted in the fees at issue.

Plaintiffs' Complaint alleges this practice is unfair and unlawful, describing various legal theories and citing legal authorities in the effort to seek redress for harmed Wells Fargo accountholders, which they allege number in the "thousands, if not millions of consumers." (Doc. 26 at 353.) Echoing a Consumer Financial Protection Bureau Bulletin, of which Defendant asked the Court to take Judicial Notice, Plaintiffs allege that accountholders could not reasonably avoid the fees incurred because they were not in a position to know whether the checks would clear.[2] (Complaint, Doc. 1, ¶7; RJN, Doc. 22)

Defendant has submitted both a Motion to Compel Arbitration and a Motion to Dismiss the Complaint (Docs. 18, 20). The parties have submitted various memoranda of law in support and opposition to these motions (Docs. 19, 21, 26, 31, 32, 34), as well as declarations, (Docs. 23, 27, 28, 29, 30, 33), and accompanying exhibits to support their positions. (Docs. 22-1, 22-2, 23-1, 23-2, 23-3, 23-4, 23-5, 23-6, 23-7, 23-8, 33-1, 33-2, 33-3, 33-4.) Following oral argument in this case, Wells Fargo filed a Motion for Leave to Supplement the Record accompanied by a Declaration, which motion the Court presently GRANTS and considers below. (Docs. 41-42) For the reasons set forth below, the Court GRANTS the Motion to Compel Arbitration, STAYS the proceedings, and DENIES the Motion to Dismiss.

## I.    FACTS

The record in this case identifies several interactions between each of the four Plaintiff accountholders and the Defendant Wells Fargo. The Court has considered separately each Plaintiff's unique interactions with Wells Fargo in its analysis of contract formation. Nevertheless, in the interest of concision, the Court summarizes below similar facts and issues

---

[2] A court "may take judicial notice of judicial opinions and public records." *Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005). This Court has reviewed Bulletin 2022–06: Unfair Returned Deposited Item Fee Assessment Practices, issued by the Bureau of Consumer Financial Protection on November 7, 2022. (Doc. 22-2.) Plaintiff also referenced the same Bulletin in the Complaint. The document does not play a role in the Court's decision.

that are applicable to multiple plaintiffs and, for the same reason, omits multi-page excerpts of the agreements at issue.

The first set of interactions is the account opening or account joining transaction of each Plaintiff. (Complaint, Doc., 1 ¶¶4, 34; Arif Decl., Doc. 27 ¶¶ 4-5; Ellish Decl., Doc. 30 ¶4; Choijin Decl., Doc. 28 ¶4-5; Bayarsaiahan Decl., Doc. 29 ¶4; Ward Decl., Doc. 23 ¶¶8, 11 14.) Ms. Bayarsaihan, became an accountholder in circumstances somewhat different from the other three Plaintiffs; she joined the existing account of her husband, Mr. Choijin. (Bayarsaihan Decl., Doc. 29 ¶4; Ward Decl., Doc. 23 ¶8.) Nevertheless, her account of the account-joining transaction resembles the account-opening transactions of the other Plaintiffs. During these in-person transactions, each Plaintiff signed an account application with a paragraph of text that mentioned Wells Fargo's dispute resolution program and states "our disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge." (Docs. 23-1, 23-4, 23-7, 33-1.)

Each account application also mentions other documents issued by the bank, which by the terms of the application, the Plaintiffs purportedly "received." (Docs. 23-1, 23-4, 23-7, 33-1.) The wording and documents referenced vary across the four applications.

The Arif application, dated August 16, 2013, refers to his receipt of "the applicable account agreement, the privacy policy, and the Direct Deposit Advance Service Agreement and Product Guide[] (as each may be amended from time to time)." (Doc. 23-7 (emphasis omitted).) The "the applicable account agreement" mentioned in the Arif application is presumably an account agreement issued by Wells Fargo before August 16, 2013, the date of his application. (Oral Argument at 1:07:15.) Following oral argument, Wells Fargo produced for the record an excerpt of a Consumer Account Agreement dated April 1, 2013, which constitutes nine pages of general terms and terms related to arbitration. (Doc. 42-2 at 496.)

The Ellish application, dated December 22, 2020, refers to his receipt of "of the applicable account agreement and the privacy policy (each may be amended from time to time)." (Doc. 23-4 (emphasis omitted).) The "applicable account agreement" mentioned in the Ellish application is, according to Wells Fargo, the Deposit Account Agreement of July 24, 2019, which Wells Fargo produced, together with the accompanying Consumer Account Fees and Information

Schedule of the same date, as Exhibits to the first Ward Declaration. (Docs. 23-2, 23-3, Oral Argument at 1:35:54-1:36-45.) This agreement contains a 2-page "Arbitration Agreement" under the Heading "Resolving disputes through arbitration (Consumer accounts only)," as well as various general terms relevant to consumer disputes, such as choice of law provisions, and terms describing the structure of the agreement and amendment process. (Doc. 23-2 at 173-6, 180-2.) In addition, the agreement contains various commercial terms, describing bank processes and fees. (Doc. 23-3.)

The Choijin application, dated October 28, 2002, refers to his receipt of "Consumer Account Agreement, Consumer Account Fee and Information Schedule, and Privacy Policy." (Doc. 23-1.) The Consumer Account Agreement, Consumer Account Fee and Information Schedule and Privacy Policy mentioned in the Choijin application are presumably documents that were issued by Wells Fargo before October 28, 2002. No such documents appear in the record. (Dkt.; Oral Argument at 1:26:01-1:26-44.)

The Bayarsaihan application, dated July 20, 2004, refers to her receipt of "of the applicable account agreement and privacy brochure . . ., including the terms of the Direct Deposit Advance® Service." (Doc. 33-1 (emphasis omitted).) The "applicable account agreement and privacy brochure" mentioned in the Bayarsaihan application are presumably documents that were issued by Wells Fargo before July 20, 2004. Following oral argument, Wells Fargo produced for the record excerpts of Consumer Account Agreement and Safe Deposit Box Lease Terms dated April 1, 2003, which constitute eight pages of general terms and terms related to arbitration. (Doc 42-1 at 486.)

Each Plaintiff, in slightly different words, resists the conclusion that he or she received notice of longer agreements separate from the account application. (Doc. 27, Arif Decl. ¶¶ 5-6).

In describing his account opening, Mr. Arif has declared,

> I signed a signature card but was not shown the specific terms of the DAA [Deposit Account Agreement] relating to arbitration or any dispute resolution program at any point before or while opening my account. . . . I did not receive notices of any updates to the DAA and did not receive the DAA and was unaware of the provisions therein until after filing this lawsuit. I had no intention of agreeing to terms I had not personally reviewed, and no one at Wells Fargo verbally informed me about any arbitration agreement, dispute resolution

4

program, or class action waiver in those documents. / I never knowingly assented
to arbitrate my claims against Wells Fargo."

(Doc. 27, Arif Decl. ¶¶ 5-6).

In describing his account opening, Mr. Ellish declared:

I signed a signature card but was not given a copy of the Deposit Account Agreement
("DAA") beforehand. Aside from the signature card, I was not provided with any
physical documents to sign or review before signing. I was not shown the specific terms
of the DAA or the terms of the arbitration agreement or dispute resolution program
therein at any point before or while opening my account. I was not shown the specific
terms of the DAA or the terms of the arbitration agreement or dispute resolution program
therein at any point before or while opening my account. I did not receive notices of any
updates to the DAA and did not receive the DAA and was unaware of the provisions
therein until after filing this lawsuit. I had no intention of agreeing to terms I had not
personally reviewed, and no one at Wells Fargo verbally informed me about any
arbitration agreement, dispute resolution program, or class action waiver in those
documents. / I never knowingly assented to arbitrate my claims against Wells Fargo.

(Doc. 30, Ellish Decl. ¶ 5.)

In describing his account opening, Mr. Choijin declared:

I signed a signature card but was not given a copy of the Deposit Account Agreement
("DAA") beforehand. Aside from the signature card, I was not provided with any
physical documents to sign or review before signing. I was not shown the specific terms
of the DAA or the terms of the arbitration agreement or dispute resolution program
therein at any point before or while opening my account. I did not receive notices of any
updates to the DAA and did not receive the DAA and was unaware of the provisions
therein until after filing this lawsuit. I had no intention of agreeing to terms I had not
personally reviewed, and no one at Wells Fargo verbally informed me about any
arbitration agreement, dispute resolution program, or class action waiver in those
documents.

(Doc. 28, Choijin Decl. ¶5.)

In describing her account-joining transaction, Ms. Bayarsaihan declared:

I did not receive a copy of the Deposit Account Agreement ("DAA") in
connection with me being added to my husband's account. . . . At no time during
the process of being added to my husband's account did anyone at Wells Fargo
explain to me the terms of the DAA, any dispute resolution program, including
arbitration, or class action waiver.

(Doc. 29, Bayarsaihan Decl., ¶¶5-6.) The record reflects that the parties had a dispute about whether Ms. Bayarsaihan signed the account application, but this was resolved at oral argument. As was agreed, she had signed the account application. (Oral Argument at 1:01:10-1:01:36.)

According to the Declaration of Wells Fargo Business Execution Consultant Tiffany Ward, Wells Fargo customers opening accounts are "presented with copies of Wells Fargo's operative Deposit Account Agreement . . . and Consumer Account Fee and Information Schedule . . . for their review." (Ward Decl., Doc. 23 ¶6.) This Declaration describes Wells Fargo's intended practice for account opening (apparently at the present time). Whether this account practice was in effect in 2002 at the time of the Choijin account opening, in 2004 at the time of the Bayarsaihan account joining, in 2013 at the time of the Arif account opening or 2019 at the time of the Ellish account opening remains unclear. Further, whether the practice of providing additional documents was followed in the case of Mr. Choijin, Ms. Bayarsaihan, Mr. Arif, or Mr. Ellish are questions of fact clouded by other open questions, such as which employee(s) worked with these Plaintiffs to open the accounts, whether the employee(s) were trained in and consistently complied with the procedures described in the Ward Declaration, and whether those employees recall providing the Plaintiffs with the referenced documents. Taking the allegations in the light most favorable to the non-moving party, the Court assumes the documents referenced in the applications were not provided to the Plaintiffs upon account opening.

The next set of interactions between the Plaintiffs and Wells Fargo disclosed in the record relates to the assessment of a $12.00 Deposit Item Return Unpaid Fee of $12.00. The Arif account incurred this fee on or around April 6, 2022. (Complaint, Doc. 1, ¶ 38; Ward Decl., Doc. 23 ¶15). The Ellish account incurred this fee on or around October 20, 2021. (Complaint, Doc. 1, ¶¶44-5; Ward Decl., Doc. 23 ¶13). The Choijin/Bayarsaihan account incurred this fee on or around March 12, 2020. (Complaint, Doc. 1, ¶¶49-51; Ward Decl., Doc. 23 ¶10).

The last set of interactions between Plaintiffs and Wells Fargo disclosed in the record relates to the issuance of account statements in March 2023. The account agreement that Wells Fargo issued to govern consumer accounts that would have been in effect at the time appears to be the agreement of the Deposit Account Agreement of October 15, 2021. (Docs. 23, 23-5). Wells Fargo has produced an account statement addressed to Mr. Arif, dated March 31, 2023, an account statement addressed to Mr. Ellish, dated March 15, 2023, and an account statement

addressed to Mr. Choijin and Ms. Bayarsaihan, dated March 23, 2023. (Docs. 33-2, Doc. 33-3, and Doc. 33-4.) Though the pagination differs across these statements, each contains the same text following the list of account transactions:

> For a complete list of fees and detailed account information, see the disclosures applicable to your account or talk to a banker. Go to wellsfargo.com/feefaq for a link to these documents, and answers to common monthly service fee questions.
>
> (Doc. 33-2 at 426; Doc. 33-3 at 436; Doc. 33-4 at 441.)

Each account statement also includes a large heading labeled "Important Account Information" followed by approximately two and a half pages of fine print organized under several boldface subheadings, including one boldface heading that asks, "Can we reach you when it's really important?" (Doc. 33-2 at 427-9, Doc. 33-3 at 437-8; Doc. 33-4 at 442-3.)

Under the "Important Account Information" heading, following nearly a page of text about Campus Card fee benefits, the following sentence appears in the account statement: "Consumer Account Fee and Information Schedule and Deposit Account Agreement, as amended, continue to apply." (Doc. 33-2 at 427; Doc. 33-3 at 437; Doc. 33-4 at 443.)

The statement also provides, "Effective February 22, 2023, the fee for cashed or deposited items that are returned unpaid has been eliminated for consumer checking and savings accounts. As such, Wells Fargo will no longer charge a fee when cashed or deposited items are returned unpaid for any reason for consumer accounts." (Doc. 33-2 at 427; Doc. 33-3 at 437; Doc. 33-4 at 443.)

The Declaration of Wells Fargo's Business Execution Consultant Tiffany Ward states:

> "[I]t is Wells Fargo's regular practice to provide monthly account statements for consumer checking accounts which notify consumers regarding any updates or changes to the Account Agreement and Fee Schedule. These statements are available to consumers online, and are additionally provided directly to consumers either via email or mail, depending on the consumer's preference.

(Doc. 33 ¶7.) Ms. Ward's declaration states that the account statements were "available" to accountholders without describing what steps they would need to undertake to access the statements (such as logging into an online account, clicking through certain links) nor what the accountholders would have seen (the layout of the screens). The Declaration does not specify how this process worked for each particular Plaintiff, when each statement was made available to

7

its respective accountholder(s) and whether there is any evidence that they accessed the account or actually viewed the March 2023 statements. Ms. Ward states in her Supplemental Declaration that, according to account records, the Arif, Ellish and Choijin accounts were "enrolled in online banking and online statements." (Doc. 33 ¶9.) Ms. Ward describes a general process for enrolling in online statements that involves verifying the recipient email address. (Doc. 33 ¶8.) [3] The Supplemental Declaration suggests (without stating explicitly) that Ms. Bayarsaihan had not enrolled in online banking. The Supplemental Declaration indicates that an account statement was mailed to Ms. Bayarsaihan. (Doc. 33 ¶9.) Wells Fargo does not provide a stamped envelope, record of postage paid specific to Ms. Bayarsaihan's statement or other documentation of the mailing; however, Ms. Ward adds "there is no evidence of returned mail from the address they provided to Wells Fargo."[4]  (Doc. 33 ¶9.)

The record does not contain any screen shots nor descriptions of the steps the Plaintiffs would need to undertake to access the Deposit Account Agreement of October 15, 2021 if they chose to visit the website mentioned in the account statement: wellsfargo.com/feefaq. If Wells Fargo has any evidence indicating how common it is for these Plaintiffs or other customers to view documents that become available online, how often they click through the hyperlinks, and/or how quickly they take such actions after statements become available online, it has not produced this evidence for the record.

## II.    MOTION TO COMPEL ARBITRATION

### A.  The Federal Arbitration Act (FAA) Framework

Defendant Wells Fargo argues that the Federal Arbitration Act, 9 U.S.C. § 2, applies because the parties' relationships, which involves interstate commerce, are governed by an

---

[3] With respect to the delivery of account statements and terms contained therein, Ms. Ward declares, "Where an accountholder's delivery preference is electronic, statements are considered received when they are available online." (Doc. 33 ¶8.) The Court understands this to mean that *Wells Fargo* "considers" the statements received once they are available online. In the present case, there is a dispute about whether plaintiffs agreed to the full terms that would give effect to the notion that statements are received when available online.

[4] Despite the assertion that the statement was mailed to Ms. Bayarsaihan, the Ward declaration cites to the Deposit Account Agreement stating, "For joint accounts, only one owner receives notifications and statements, and that owner agrees to provide copies to all other account owners. (Doc. 33 ¶7.) The inconsistency in Wells Fargo's approach to Ms. Bayarsaihan – whether she was entitled to her own account statements and notices – is of limited significance, but it suggests the complexity and unintuitive nature of applying corporate processes to specific individuals, including the possibility that a patchwork of practices do not always work in concert.

arbitration agreement. (Doc. 19 at 122, n.4.) Plaintiffs counter that the FAA, "by its terms, does not apply until the arbitration clause in question is determined to be part of the contract between the parties." (Doc. 26 at 358.) Either way, the analysis is the same and proceeds in two steps: Is there a binding arbitration agreement? Is the present action within the scope of the arbitration agreement? *Pro Tech Indus., Inc. v. URS Corp.*, 377 F.3d 868, 871 (8th Cir. 2004) ("A court's role under the FAA is . . . limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute."). Simply put, the FAA requires courts to compel arbitration of disputes that are within the scope of valid arbitration agreements.

Wells Fargo spends considerable space addressing whether the parties decided to delegate the threshold issue of arbitrability to the arbitrator—what the U.S. Supreme Court recently described as a "third-order" dispute regarding arbitration.[5] The Court recently clarified that these "third-order questions are . . . matters of consent," for which "[a]s always, traditional contract principles apply." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 149 (2024). For each of the issues below, the Court considers whether they are within the scope of a valid arbitration agreement and, thus based on the intended scope of the agreement, subject to the determination of an arbitrator.

Defendant argues that the terms of the currently operative account agreements, which were attached to the Complaint, form a valid arbitration agreement between Wells Fargo and Plaintiffs and govern their relationship. (Doc. 19, at 118; Doc. 1-1.) Plaintiffs deny that it was ever their intention to arbitrate disputes with Wells Fargo and argue that the bank has not met its burden in demonstrating a valid arbitration agreement was formed. (Doc. 26 at 353).

The party seeking to compel arbitration, bears the burden of proving that the arbitration agreement exists. *Anhui Powerguard Tech. Co., Ltd. v. DRE Health Corp.*, 95 F.4th 1146, 1149 (8th Cir. 2024) ("[T]he party seeking to compel arbitration[] bears the burden of proving that such an agreement exists and is enforceable."). In cases where this burden has been met, the

---

[5] The U.S. Supreme Court has considered four "layers" of questions raised by arbitration disputes, describing the merits of a dispute as a "first order" question, the arbitrability of the dispute as a "second order" question, the delegation (or not) of arbitrability as a "third order" question, and the resolution of conflicting agreements about arbitrability as a "fourth" order question. *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148-9 (2024); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995).

party resisting arbitration bears the burden of advancing an arbitration-neutral contract defense. *Triplet v. Menard, Inc.*, 42 F.4th 868, 870 (8th Cir. 2022) ("The party resisting arbitration bears the burden of showing either that the arbitration provision is invalid or that it does not encompass the claims at issue."). Here, Wells Fargo will prevail on the Motion to Compel Arbitration if it proves the existence of a valid arbitration agreement and if plaintiff fails to prove an arbitration neutral defense.

### B. State Contract Law

Under the FAA framework, this Court looks to state contract law to determine whether an arbitration agreement was formed. *Triplet*, 42 F.4th at 871 ("State contract law governs whether a valid agreement to arbitrate exists."). The parties agree that Mr. Arif's claims are governed by New Jersey law, [6] Mr. Ellish's by Nevada law, and Mr. Choijin and Ms. Bayarsaihan's by California law. (Doc. 19 at 120; Doc. 26 at 358.)

The basics of contract law are consistent across these states. Each of the three states apply an objective standard to reviewing manifestations of assent to contract. *Sellers v. JustAnswer LLC*, 73 Cal.App.5th 444, 460 (2021) ("Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings."); *James Hardie Gypsum (Nevada), Inc. v. Inquipco*, 112 Nev.1397, 1402 (1996) ("The fact finder should look to objective manifestations of intent to enter into a contract."), *abrogated on other grounds by Sandy Valley Assocs. v. Sky Ranch Estates Owners Ass'n*, 117 Nev. 948, 35 P.3d 964, 968–69 & n. 6 (2001); *Brawer v. Brawer*, 329 N.J. Super. 273, 283 (App. Div. 2000) ("[A party's] objective manifestations of intent are sufficient and controlling.").

Under this objective standard, a party can be bound to a contract it has not read. *B.D. v. Blizzard Entertainment, Inc.*, 76 Cal.App.5th 931, 943 (9th Cir. 2022) ("If an offeree objectively manifests assent to an agreement, the offeree cannot avoid a specific provision of that agreement on the ground the offeree did not actually read it."); *Yerington Ford, Inc. v. Gen. Motors Acceptance Corp.*, 359 F. Supp. 2d 1075, 1090 (D. Nev. 2004) ("Parties may be held to contracts

---

[6] Although there is a discrepancy in the record as to whether New York or New Jersey is the location of the Arif account opening, which could give rise to an argument that New York law governs his claims, the parties agree to apply New Jersey law for purposes of the present motion to compel. (Oral Argument 1:00:04-1:00:16.)

they never read."), *rev'd on other grounds, sub. nom. Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865 (9th Cir. 2007); *Santana v. SmileDirectClub, LLC*, 475 N.J. Super. 279, 288, (App. Div. 2023) (quoting *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 74-5 (2d Cir. 2017) ("[W]here there is no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms.").

Yet, a consumer signatory will only be bound to such a contract if a reasonably prudent consumer would have inquired further and become aware of the terms. Variations of this "inquiry notice" rule are found in cases applying California, Nevada, and New Jersey contract law. *Fong v. U.S. Bancorp,* No. 23-16186, 2024 WL 3439584, at *2 (9th Cir. July 17, 2024) (vacating district court order compelling arbitration where "it would not have been clear to a reasonable consumer under the circumstances that the Safe Deposit Box Contract represented a new agreement"); *In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1064, 1066 (D. Nev. 2012) (holding consumers did not agree to arbitration agreement under Nevada law where "a highly inconspicuous hyperlink buried among a sea of links" did not provide constructive notice); *Fairfield Leasing Corp. v. Techni-Graphics, Inc.*, 256 N.J. Super. 538, 543 (Law. Div. 1992) (declining to enforce jury trial waiver that was "utterly inconspicuous" where a reasonable person would not have noticed it).

Neither party has highlighted any discernible difference in the contract law principles of the states involved. There is some variation across the existing caselaw addressing similar issues of contract formation, but this variation appears to stem from the fact-intensive nature of the inquiry into contract formation, not from divergent sets of rules. Determining whether a contract between a business and a consumer was formed "is based on the totality of the circumstances and requires a case-by-case, fact-intensive analysis in light of the ordinary behavior and perspective of consumers engaged in the type of transaction at issue, and their interaction with the business." RESTATEMENT OF LAW, CONSUMER CONTRACTS § 2.[7]

---

[7] The three states whose contract law is considered in this case take different views on whether the issue of contract formation should be reviewed as a question of law or a question of fact. *Compare Anderson v. Sanchez*, 132 Nev. 357, 360 (2016) ("Whether a contract exists is a question of fact . . . and this court will defer to the district court unless the factual findings are clearly erroneous or not supported by substantial evidence."); *Whitemaine v.*

Internet contracts are governed by the same underlying concepts of contract law as contracts executed in other settings. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract.") (quoting *Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 403 (2d Cir.2004)); *Wollen v. Gulf Stream Restoration & Cleaning, LLC*, 468 N.J. Super. 483, 496–97 (App. Div. 2021) ("[I]nternet contracts are not all that different from traditional, written contracts containing arbitration provisions."); *In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1063-4 (D. Nev. 2012) (citing cases reviewing California, Illinois and New York law on in describing requirements of internet contract formation). Nevertheless, the unique forms of communication facilitated by the internet have given rise to a distinct body of caselaw analyzing modes of offer and manifestations of assent made over the internet.

California caselaw on internet contract formation is more robust than that of many other states. As outlined below, courts reviewing California law have categorized internet contracts based on the forms of notice and assent common in internet transactions and elaborated a two-step method for analyzing the conspicuousness of the notice. "To determine whether knowing consent has been established when forming a contract over the Internet, courts have created a constructive or inquiry framework, which requires [Wells Fargo, in this case] to show that '(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound, and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.'" *Lawrence v. Finicity Corp.*, 716 F. Supp. 3d 851, 882 (E.D. Cal. 2024) (citing *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022)), *rev'd Lawence v. Finicity Corp.*, No. 24-1737, 2025 WL 547375, at *2 (9th Cir. Feb. 19, 2025). This framework appears to be consistent with the approach of Nevada and

---

*Aniskovich*, 124 Nev. 302, 308 (2008) (contrasting questions of contract interpretation, reviewed de novo, with factual questions of "whether a contract exists," reviewed for substantial evidence.); *with DeLeon v. Verizon Wireless*, LLC, 207 Cal. App. 4th 800, 813 (2012) ("Although mutual consent is a question of fact, whether a certain or undisputed state of facts establishes a contract is a question of law for the court."); *cf. Sun Coast Merch. Corp. v. Myron Corp.*, 393 N.J. Super. 55, 71 (App. Div. 2007) ("Whether a contract . . . was formed was a question mired in factual disputes and uncertainties."). This variation might interest appellate courts reviewing contract formation questions that involve plaintiffs from various states, but it has little bearing on the issues that need this Court's attention. The unique record and arguments before the Court determine the outcome of the present case; with respect to each plaintiff, this is a fact-intensive inquiry within the framework of the governing case law.

New Jersey, which analyze internet contracts for the conspicuousness of their notice and evaluate user's expressions of assent. *Wollen v. Gulf Stream Restoration & Cleaning, LLC*, 468 N.J. Super. 483, 497 (App. Div. 2021) ("Regardless of a web-based agreement's characterization, however, the pertinent inquiry is whether the user was provided with reasonable notice of the applicable terms, based on the design and layout of the website."); *In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1063-4 (D. Nev. 2012) (holding consumers did not agree to arbitration where they did not have constructive notice). "[A] consumer is bound by an arbitration clause if a reasonably prudent Internet consumer would be put on inquiry notice of the agreement's existence and contents" before expressing assent. *In re Juul Labs, Inc., Antitrust Litigation*, 555 F.Supp.3d 932, 947 (N.D. Cal. Aug. 19, 2021) (internal quotations and citation omitted) (concluding consumers agreed to arbitration and severing unconscionable shortening of statute of limitations from other terms of arbitration agreement).

California courts have identified four categories of internet contract formation, "most easily defined by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps." *Seneca v. Homeaglow, Inc.*, Civ. No. 8:23-2308, 2024 WL 750029, at *3 (C.D. Cal. Feb. 7, 2024) (quoting *B.D. v. Blizzard Ent., Inc.*, 292 Cal. Rptr. 3d 47, 60 (Cal. App. 2022)); *see also Keebaugh v. Warner Bros. Entertainment Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024). [8] "Although there is no per se rule

---

[8] "A '*browsewrap*' agreement is 'one in which an internet user accepts a website's terms of use merely by browsing the site.'" *Keebaugh*, 100 F.4th at 1014 (quoting *Sellers v. JustAnswer LLC*, 73 Cal.App.5th 444, 463 (2021)). "Courts have consistently held this type of agreement to be unenforceable, as individuals do not have inquiry notice." *Id.*

"A '*clickwrap*' agreement is one in which an internet user accepts a website's terms of use by clicking an "I agree" or "I accept" button, with a link to the agreement readily available. *Sellers*, 73 Cal.App.5th at 463. "In most instances, the contractual terms are not actually displayed on the same screen as the 'I accept' button, but are instead provided via a hyperlink that, when clicked, takes the user to a separate page displaying the full set of terms." *Id.* "Courts have 'routinely found clickwrap agreements enforceable.'" *Keebaugh*, 100 F.4th at 1014 (quoting *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022)).

Among the four forms of internet contract identified above, the agreement with the strongest notice is the scrollwrap agreement, where the user must scroll through all the terms before the user can click the mandatory "I agree" box and proceed to use the web-based service. *Sellers*, 73 Cal. App. 5th at 470.

The final category, sign-in-wrap agreements "include a textual notice indicating the user will be bound by the terms, but they do not require the consumer to review those terms or to expressly manifest their assent to those terms by checking a box or clicking an 'I agree' button." *Sellers*, 73 Cal.App.5th at 471. "Instead, the consumer is purportedly bound by clicking some other button that they would otherwise need to click to continue with their transaction or their use of the website—most frequently, a button that allows the consumer to 'sign in' or 'sign up' for the account." *Id.* "Thus, it is not apparent that the consumer is aware that they are agreeing to contractual terms simply by clicking some other button. Instead, the consumer's assent is 'largely passive,' and the existence of a

of validity or invalidity [based on the classification of a contract as a "clickwrap," "browsewrap," or otherwise], [the Ninth] Circuit has recognized that the closer digital agreements are to the clickwrap [or more recently, scrollwrap] end of the spectrum, the more often they have been upheld as valid and enforceable," while the closer they are to the "browsewrap" end of the spectrum, the less likely they are to be enforceable. *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1165 (N.D. Cal. 2016).

In addition, interpretating California law, the Ninth Circuit has articulated a two-part test for evaluating whether online terms are reasonably conspicuous: "[W]e must look to both 'the context of the transaction' and the 'placement of the notice' . . . .". *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1019–20 (9th Cir. 2024) (quoting *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856-7 (9th Cir. 2022)). In evaluating the context of the transaction, the Court considers details such as the duration of the relationship the transaction aims to establish and nature of the goods or services being transacted. *See Keebaugh*, 100 F.4th at 1020 (taking note of the "ongoing" relationship parties sought to establish and nature of downloading "a mobile game with potentially unlimited in-app purchases," as distinct from "buying two tablet devices, purchasing a single flower arrangement, or signing up for a $5 trial") (internal citations omitted). Depending on the case, there might be other factors that shed light on the nature of the relationship and transaction (e.g. communications such as advertisements or employee comments that may inform the internet user about the transaction, the timing of the transaction, the degree of trust involved, or data in the record describing the frequencies of transactional elements). In evaluating the placement of the notice, a court considers various visual elements, such as the size and color of the fonts, customary design elements denoting the existence of a hyperlink, whether the screen is cluttered with distracting text and images, and borders or other visual elements that may draw attention to certain text. *Id.* at 1020-1. Taking into account these factors in a given case, courts consider how clearly the language presented denotes the consequences of the website user's next action – whether that is clicking "accept," proceeding to another screen, or continuing to use the website – and determines whether the notice was sufficiently conspicuous to bind an internet user. While the two-part analysis of "context" and "visual notice" articulated in *Keebaugh* only applies to internet contract and not to transactions that occur in person or through other means of communication,

---

contract turns on whether a reasonably prudent offeree would be on inquiry notice of the terms at issue." *Id* (quoting *Selden v. Airbnb, Inc.*, No 16-cv-00933, 2016 WL 6476934 at *5 (D.D.C. Nov. 1, 2016)).

this two-part inquiry closely resembles the analysis a court undertakes to understand the facts and circumstances of a traditional contract transaction.

The inquiry notice analysis – whether arising in the context of an internet transaction or otherwise – typically arises in situations where a company seeks to hold a consumer to terms that are separate from a "cover" document that consumers might see and acknowledge; therefore, analyzing the question of contract formation in terms of inquiry notice resembles the analysis as to whether a separate document is incorporated by reference into a contract. Review of the caselaw indicates that incorporation by reference requires at least the degree of specificity and availability of additional terms required by the "inquiry notice" doctrine. *Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn*, 410 N.J. Super. 510, 520, 533, 535 (App. Div. 2009) (internal quotation omitted) (rejecting terms that plaintiff sought to incorporate into contract where "there is no indication that the terms of the proposed incorporated document were known or assented to by defendants" who were informed that "whether or not you request [policies], you will be bound by our standard billing practices and firm policies"); *Lincoln Welding Works, Inc. v. Ramirez*, 98 Nev. 342, 345–46 (1982) (concluding "that the parties intended to incorporate the prime contract into the subcontract" where "record reflects appellant was acquainted with plans and specifications embodied in the voluminous prime contract"); *DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 713 (2009) ("The general rule is that the terms of an extrinsic document may be incorporated by reference in a contract so long as (1) the reference is clear and unequivocal, (2) the reference is called to the attention of the other party and he consents thereto, and (3) the terms of the incorporated document are known or easily available to the contracting parties."); *Hirsch v. Citibank, N.A.*, 603 F. App'x 59 (2d Cir. May 13, 2015) (affirming conclusion that additional terms were not incorporated by reference into signature card where "the signature cards were so broadly worded that a reasonable person would not be on notice as to what external terms and conditions applied to the agreement to open the account"). Whether a party has inquiry notice of additional terms and whether those terms are incorporated by reference will depend on the record of each case and often require consideration of the same documents.

An additional consideration in the context of contract formation is whether the terms of a contract are sufficiently definite that the parties can ascertain their obligations. New Jersey contract law, like that of California and Nevada, recognizes that courts cannot enforce a contract

whose terms are too indefinite. *Leitner v. Braen*, 51 N.J. Super. 31, 39 (App. Div. 1958) ("To be enforceable, a contract must be sufficiently definite in its terms that the performance to be rendered by each party can be ascertained with reasonable certainty."); *May v. Anderson*, 121 Nev. 668, 672–74 (2005) ("In the case of a settlement agreement, a court cannot compel compliance when material terms remain uncertain."); *Ladas v. California State Auto. Assn.*, 19 Cal. App. 4th 761, 771 (1993) ("An amorphous promise to "consider" what employees at other companies are earning cannot rise to the level of a contractual duty."); *see also GWG DLP Funding V, LLC v. PHL Variable Ins. Co.*, 54 F.4th 1029, 1034 (8th Cir. 2022) (recognizing under Connecticut law that if "any essential matters are left open for further consideration, [a] contract is not complete") (quoting *Geary v. Wentworth Labs., Inc.*, 60 Conn.App. 622, 627 (2000)). As addressed below, this Court has considered the clarity and definiteness of the obligations described by the documents at issue in this case.

### C. Reviewing the Record

In order to determine whether an arbitration agreement was formed, the Court must examine the pleadings and other documents in the record. Where the parties have submitted matters outside the pleadings, such as affidavits and exhibits, on a motion to compel arbitration, such a motion should be considered using summary judgment standards. *City of Benkelman, Nebraska v. Baseline Engineering Corporation*, 867 F.3d 875, 882 n.8 (8th Cir. 2017); *Nebraska Mach. Co. v. Cargotec Sols., LLC*, 762 F.3d 737, 742 (8th Cir. 2014) ("Given that both parties relied on matters outside the pleadings and sought summary judgment-type rulings, a summary judgment standard—viewing the evidence and resolving all factual disputes in the nonmoving party's favor—should have been used to evaluate the motions."). In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 US. 242, 249 (1986). Applying the standard of review for summary judgment, this Court faced with factual discrepancies, draws "all reasonable inferences" in favor of the non-moving party. *Bigham v. R&S Heating and Air Conditioning, Inc.*, 182 F.Supp.3d 919, 923 (D. Minn. 2016). "'Only when there is no genuine issue of fact concerning the formation of the agreement' should the court decide as matter of law that an agreement to arbitrate existed." *Card v. Wells Fargo Bank, N.A.*, 611 F.Supp.3d 1080, 1083 (D. Or. 2020) (quoting *Three Valleys Mun. Water Dist. V. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991)); *Foster v. Walmart, Inc.*,

15 F.4th 860, 861 (8th Cir. 2021) (remanding case for trial on question of arbitration agreement's formation).

Before proceeding to apply the governing contract law to the present record, the Court acknowledges that each party has urged the Court to recognize among the existing case law cases where the specific state of the facts is purportedly indistinguishable from the present case and would compel a particular outcome as a conclusion of law. For example, the parties have cited cases that evaluate whether an arbitration agreement was formed when one party produces a signed document that references arbitration and the other party contends the document is insufficient to show a valid arbitration agreement was formed. *See Bacon v. Avis*, 959 F.3d 590, 600-603 (3rd Cir. 2020) (concluding that the agreements signed by plaintiffs did not bind them to arbitrate claims where they were not on reasonable notice of the arbitration terms found in a rental jacket); *Dreyfuss v. eTelecare Glob. Sols.-U.S. Inc.*, 349 F.App'x 551, 552-3 (2d Cir. 2009) (concluding party seeking to compel arbitration failed to make a prima facie showing that an arbitration agreement existed where it produced only the first page and signature page of the purported arbitration agreement); *Cook v. Wells Fargo*, 731 F.Supp.3d 1335, 1341-4 (S.D. Ga. 2024) (denying motion to compel in case where employee's declaration about Wells Fargo's practice of providing agreements to consumers was insufficient to support the conclusion that plaintiffs received the bank's Deposit Account Agreement or subsequent updates); *cf. Safadi v. Citibank, N.A.*, 2012 WL 4717875, at *4 (N.D. Cal. Oct. 2, 2012) (concluding consumer bound by arbitration agreement where he did not recall if the agreement governing the account was included in a packet of information received in connection with account opening); *Mission Viejo Emergency Med. Assocs. v. Beta Healthcare Grp.*, 197 Cal. App. 4th 1146, 1153–54, 1160 (2011) (compelling arbitration of insurance dispute over professional liability where arbitration language in the insurance policy was binding on medical practice). The parties have also cited and the Court has considered cases addressing whether a consumer's continued use of a company's services establishes a contract in situations where the company has issued new governing terms. *See, e.g.*, *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016) (declining to enforce California choice-of-law provision despite finding that agreement was formed); *Moran v. Charter Communs., Inc.*, 2020 WL 5833640, at *3 (C.D. Cal. June 11, 2020) (compelling arbitration where there was "undisputed evidence that Charter mailed Moran's billing statements to the service address listed on his account" that included

notice of arbitration terms); *Land v. IU Credit Union*, 218 N.E.3d 1282 (Ind. 2023) (finding "no objective manifestation of intent to accept [arbitration terms] through Land's continued use of her checking accounts"); *Planters Bank, Nat'l Ass'n v. Rogers*, 912 So. 2d 116, 120 (Miss. 2005) ("[W]aiving the right to have access to the courts is something much more significant and of a different character than changing the terms and conditions of a bank account, assent for which can be contained simply by the continued use of the account."); *cf. Veribi, LLC v. Compass Mining, Inc.*, 2023 WL 375680, at *6 (C.D. Cal. Jan. 20, 2023) (denying motion to compel arbitration and asking parties to confer on whether they would like the Court to hear oral argument on Motion to Dismiss).

The Court has thoroughly considered cases cited by the parties and other cases bearing on the issues before it. While instructive, the cases reviewed are distinguishable and do not dictate the outcome of this case. What governs the outcome of this case are the more foundational contract principles of inquiry notice and manifestations of assent, evaluated from an objective perspective, not for example, a special "rule" about the significance of signatures on account applications; nor should the present case be construed as creating a general rule about consumer account applications or other matters particular to this record. *See Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024) (internal quotations and citations omitted) ("Given that arbitration agreements are simply contracts, the first principle that underscores all of our arbitration decisions is that arbitration is strictly a matter of consent.").

The record in this case invites an inquiry into several possible ways an agreement might have been formed or become binding on Plaintiffs, including (i) through the account opening or joining transactions; (ii) through continued use of the accounts after terms were made available in connection with account statements; or (iii) by filing the present action. The Court has considered these issues with respect to each Plaintiff and the unique documents and facts of their transactions and sought clarification regarding these issues during oral argument. Nonetheless, given the similarity in the circumstances of each plaintiff, the Court has reached the same conclusion with respect to each one, as set out below.

#### i. Limited Arbitration Agreement Formed Through Application at Initial Transaction

The Plaintiffs are bound to appear "before one or more neutral persons in an arbitration proceeding" based on the language and presentation of the account applications that each Plaintiff signed. (Docs. 23-1, 23-4, 23-7, 33-1.) While not every signature card or account application presented to a bank customer will be drafted or presented in a way that forms a stand-alone agreement, the signed account applications that Wells Fargo produced for the record are clear and definite about the obligation to arbitrate and suffice to form a contract between each Plaintiff and Wells Fargo.

#### ii. Additional Terms Not Accepted at Initial Transaction

To be clear, the Court is unwilling to conclude on the present record that any of the plaintiffs had inquiry notice of the account agreements referenced in the account applications. Specifically, the Court is not convinced that the reasonably prudent consumer in Mr. Arif's shoes would have inquired about and requested copies of the "applicable account agreement, the privacy policy, and the Direct Deposit Advance Service Agreement and Product Guide" that account application states were "received." (Doc. 23-7.) In the present "information age," the reasonably prudent consumer is accustomed to undertaking various prescribed, mechanical actions to comply with corporate bureaucracy, and the Court is unwilling to conclude such a consumer would secure copies of the documents mentioned above when completing the account application, even where the application states that the documents were "received." (Doc. 23-7.) In turn, the reasonably prudent consumer would not have inquiry notice of the terms of those longer documents, and the Court is not convinced that such terms were incorporated by reference into the account application.

Nor is the Court convinced that the reasonably prudent consumer in Mr. Ellish's shoes would have inquired about and requested copies of the "applicable account agreement and privacy policy" mentioned in his application. (Doc. 23-4.) The vague reference to the "applicable account agreement" would not make the reasonably prudent consumer aware of the provisions of the Deposit Account Agreement of July 24, 2019 that specify AAA as the forum for arbitration nor the attorneys' fees provision (challenged by plaintiffs). (Doc. 23-2.) The record supports the conclusion that Mr. Ellish did not have inquiry notice of the complete arbitration

19

terms of the Deposit Account Agreement of July 24, 2019, nor were those terms incorporated into Mr. Ellish's account application by reference.

Similarly, the Court is not convinced that a reasonably prudent person would have inquired about and requested copies of the "Consumer Account Agreement, Consumer Account Fee and Information Schedule, and Privacy Policy" mentioned in Mr. Choijin's application. (Doc. 23-1.) The record supports the conclusion that Mr. Choijin did not have inquiry notice of the complete arbitration terms of the documents in effect in 2002, whatever those terms might be. Nor is there sufficient evidence that those terms were known or easily available to Mr. Choijin and thereby incorporated by reference into the account application.

The Court concludes that a reasonably prudent consumer who saw the acknowledgement clause of Ms. Bayarsaihan's account application would not have inquired about the terms of the "applicable account agreement and privacy brochure," and further concludes that Ms. Bayarsaihan did not have the requisite knowledge of those terms for them to be incorporated by reference into the acknowledgement clause of her application. (Doc. 33-1.) Although the second sentence of the acknowledgement clause indicates agreement to the "terms of the dispute resolution program described in the account agreement," the record is insufficient to show she had the requisite knowledge of those terms to be bound by them under an inquiry notice framework or an incorporation by reference theory.

### iii.  Additional Terms Not Accepted Through Account Statements

Although the account applications provide sufficient basis to compel arbitration in the case of each of the Plaintiffs, the "bare bones" nature of the agreements found in the account applications compels the Court to consider whether another legal theory could bind plaintiffs to the terms of a longer account agreement that specifies terms such as the arbitral forum.

Wells Fargo argues that Plaintiffs had notice of updates to the agreements that are reflected in monthly account statements. (Doc. 29, at 120 n.1.)  Wells Fargo further argues that "receiving regular account statements inform[ed] them of the operative terms of the Agreements," *i.e.* established inquiry notice of the arbitration terms. (Doc. 34 at 454.)  According to Wells Fargo, Plaintiffs Choijin, Bayarsaihan, and Arif used their accounts over the 10-, 20-, and 21- years that they were accountholders and must have received and reviewed account

statements during that period that gave them notice of the account agreements then in effect. (Doc. 34 at 453.) While it might be true that Plaintiffs received, and even reviewed, account statements not produced for the record, this argument is too general to analyze in a contract framework. Under a contract framework, the Court must consider what terms were at issue and purportedly agreed to.[9] The only documents available in the record for the Court to consider are the account statements of March 2023. Having considered relevant portions of the record and analyzed the requirements of conspicuous notice, the Court is not convinced that those statements or the assertions that they were made "available" to plaintiffs put them on notice of the terms of the account agreement then in effect – the agreement of October 15, 2021. (Doc. 23-5).

Even if the Court assumes each of the Plaintiffs received and opened the March 2023 account statements, the Court is not convinced that such a consumer would have reviewed the fine print following the transaction history and proceeded to find the Deposit Account Agreement of October 15, 2021 online. (Docs. 33-2, 33-2, 33-4). A reasonably prudent customer who received a March 2023 statement might have opened it – either by mail or online – and reviewed the transaction history. However, unless such a consumer had a particular concern about Campus Card fees, the Court does not believe such an individual would find the reference to the agreement nestled under the text related to changes in "Campus Card fee benefits."

Similarly, the instruction to "Go to wellsfargo.com/feefaq" appears under the heading "Monthly service fee summary" and could be understood by a reasonably prudent consumer to address fees; in fact, it is preceded by the sentence "For a complete list of fees and detailed account information, see the disclosure applicable to your account . . . ." Unless a reasonably prudent consumer reviewing the March 2023 statement happened to have questions about fees

---

[9] Wells Fargo suggests this Court take judicial notice of "the fact that banks send customers monthly bank statements," citing to a Second Circuit opinion that does so in the context of a tax dispute. (Doc. 34 at 454.) *Kaggen v. I.R.S.*, 71 F. 3d 1018, 1019-22 (2d. Cir. 1995) (concluding that bank statements detailing to whom money was paid and in what amounts were sufficient to meet statutory requirement that IRS notify taxpayers of seizure of account funds); *cf. Cook v. Wells Fargo*, 731 F.Supp.3d 1335, 1344 & n.4 (S.D. Ga. 2024) (finding no agreement to arbitrate where the declaration regarding the bank's notice practices was not accompanied by any "report, record or data compilation of how agreements were sent—mail, email, or otherwise"). Even if the Court assumes that Plaintiffs received the account statements in the record, this alone does not show that they had notice of the terms of the account agreement in effect at the time of the statements. The Court considers above whether the content of the account statements was sufficient put Plaintiffs on notice of the terms of the account agreement issued by Wells Fargo.

that reduced the account balance on that statement, it is doubtful that individual would have followed the link to wellsfargo.com/feefaq and proceeded to access the Deposit Account Agreement of October 15, 2021, even if that agreement were prominently displayed at the top of the feefaq page.

Moreover, the record does not disclose what an individual visiting the feefaq page would have seen nor identify what clicks or other actions the consumer would have had to undertake in order to reach the Deposit Account Agreement, hampering the Court's ability to analyze the conspicuousness of those terms. The Court is skeptical a reasonably prudent consumer with a question about fees would reach the Deposit Account Agreement and come across its arbitration terms if doing so would have required wading through a sea of links or other information, clicking through multiple screens, or typing additional information. The Court is not willing to fill in this information gap with speculation, nor will the Court assume that the Deposit Account Agreement would have been easily visible at the web address that Wells Fargo identified in the statements, as the Defendant has not provided images nor descriptions of what Plaintiffs would have seen at that website.

Notably, the "Important Account Information" section is only two pages of fine print (not the 41 pages of the Deposit Account Agreement of October 15, 2021 nor the 40 pages of the Deposit Account Agreement of July 25, 2023), and its relatively short length makes it more likely consumer would have reviewed it. (*Compare* Docs. 33-2, 33-3 and 33-4 *with* Docs. 1-1 and 23-5). Yet, the short length is not enough to overcome the deficiencies in the conspicuousness of the arbitration terms that Wells Fargo argues were binding on plaintiffs based on receipt of the account statements. The account statements provide insufficient evidence for the Court to conclude that the Plaintiffs are bound by the full arbitration terms of the Deposit Account Agreement of October 15, 2021.

iv.  Additional Terms Apply

This leaves the Court to consider other arguments about whether a longer and later form of arbitration agreement in the record binds the Plaintiffs to terms that are not laid out in the account applications. Although the Court has concluded that, with respect to each Plaintiff, the signed account application is sufficient to establish a contract to arbitrate, those account applications are limited. The only issue adequately addressed in each account application is the

22

requirement that disputes be "decided before one or more neutral persons in an arbitration proceeding." (Docs. 23-1, 23-4, 23-7, 33-1.) The applications do not address other topics, such as the arbitral forum or the treatment of attorneys' fees. Do Defendants other arguments give the Court cause to conclude that a longer or later form of arbitration agreement dictates the arbitral forum or governs (subject to applicable challenges) the dispute resolution process between Wells Fargo and the Plaintiffs?

Wells Fargo has raised several arguments sounding in estoppel; the Court declines to reach those issues and affirm the applicability of the Deposit Account Agreement of July 25, 2023 on those grounds. However, the Court affirms the applicability of the Deposit Account Agreement of July 25, 2023 for the reasons described below.

Although Plaintiffs do not concede receiving the Deposit Account Agreement before preparing for litigation, they attached the Deposit Account Agreement of July 25, 2023 to the Complaint with the following statement, "Plaintiff and each member of the Class entered into a uniform Deposit Agreement with Consumer Schedule with Defendant that governs the assessment of fees for certain banking services." (Doc. 1 ¶68). Even if the Plaintiffs did not accept the arbitration agreement when opening (or joining) their accounts, the Court considers whether the filing of, and references to, the Deposit Account Agreement constitute a judicial admission that Plaintiffs are bound by the arbitration terms—in other words, whether the pleading withdrew from contention any issues that could have prevented formation of the arbitration agreement.

Admissions in pleadings may be considered judicial admissions. *See Missouri Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1314-5 (8th Cir. 1990) (giving effect to admission that party signed guaranty agreement where admission was later repudiated in discovery responses but not brought to attention of court before district court decided summary judgment motion). Akin to stipulations, judicial admissions have the effect of withdrawing a fact from contention. GRAHAM, HANDBOOK OF FEDERAL EVIDENCE §801: 26. Judicial admissions are "binding upon the parties, unless withdrawn or amended." *Missouri Hous. Dev. Comm'n*, 919 F.2d at 1315. To establish that a statement constitutes a judicial admission, it must be "deliberate, clear, and unambiguous." *Acciona Windpower N. Am., LLC v. City of W. Branch, Iowa*, 847 F.3d 963, 968 (8th Cir. 2017) ("[W]e generally reject efforts to convert 'carelessly worded' stipulations into dispositive

admissions."); *see also Grandoe Corp. v. Gander Mountain Co.*, 761 F.3d 876, 885 (8th Cir. 2014) (affirming district court finding where a carelessly worded stipulation that would have "immediately defeated Grandhoe's entire case" was not a deliberate, clear and unambiguous concession that disputed agreement applied to the parties' entire transaction).

The Eighth Circuit has acknowledged tension between holding a party to an admission and allowing the party to "exercise[e] the liberal pleading . . . provisions of the Federal Rules." *Garman v. Griffin*, 666 F.2d 1156, 1159 (8th Cir. 1981) (remanding for retrial of negligence case involving fatal school bus accident where plaintiffs were permitted to admit into evidence allegation related to condition of bus sold by third party).

Rule 8 of the Federal Rules of Civil Procedure permits Plaintiffs to plead alternative claims, regardless of consistency. *See* Fed. R. Civ. P. 8(d). Pleadings are construed liberally to allow parties to develop the case, based on new information, and amend pleadings accordingly. *See In re King Enterprises, Inc.*, 678 F.2d 73, 77 (8th Cir. 1982) (affirming jury verdict where "the court properly refused to require King to elect a theory upon which to proceed"); *Rogers v. Restore Contracting, Inc.*, 721 F. Supp. 3d 630, 638 (S.D. Ohio 2024) (quoting *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) ("Although the Federal Rules of Civil Procedure 'provide for liberal notice pleading at the outset of the litigation,' '[a]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a).'") (quoting *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005)).

Acknowledging this framework, the Court may apply its discretion to relieve a party of the effects of a judicial admission. "While it is true that a judicial admission normally binds the party making it throughout the course of the action, it is also well-established that trial judges are given broad discretion to relieve parties from the consequences of judicial admissions in appropriate cases." *Elec. Mobility Corp. v. Bourns Sensors/Controls, Inc.*, 87 F. Supp. 2d 394, 406 (D.N.J. 2000) (citing Wigmore on Evidence § 2590 (Chadbourn rev.1981)).

Plaintiffs resist the applicability of the Deposit Account Agreement attached to the Complaint and requested at oral argument an opportunity to amend the Complaint and more artfully plead the claims. (Oral Argument at 1:41:26-1:41:54.) While the Court typically take a liberal position in allowing amended pleadings, the Court does not find cause to allow such an

amendment in the present case. The admission is clear and unequivocal. The suggestion at oral argument that the Complaint could be amended to address this issue is too late. In the present case the Court concludes that Plaintiffs withdrew from contention the issue of whether the arbitration agreement was formed and credits Wells Faro's argument that the Deposit Account Agreement of July 25, 2023 governs the dispute with the Plaintiffs. There would still be arbitration even if the Complaint allegations were amended. It is desirable to have some guidance for the arbitration. This does not mean that the Court endorses some of the provisions of the Deposit Account Agreement, as those issues are not before the Court.

### D. Scope of the Deposit Account Agreement of July 25, 2023

The Court leaves to the consideration of the arbitrator the challenges to the enforceability of the arbitration agreement based on interference with statutory rights and other remaining questions, including the significance of Consumer Financial Protection Bureau Bulletin 2022-06 cited by both parties and that agency's authority to identify unfair and unlawful practices under the statutes cited in footnotes of the same Bulletin. Following the approach of the Eight Circuit, this Court sees no other issues that require its consideration and analysis at this stage. *Eckert/Wordell Architects, Inc. v. FJM Props. of Wilmar, Ltd. Liab. Co.*, 756 F.3d 1098, 1100 (8th Cir. 2014)); *see also Green v. SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769 (8th Cir. 2011), *abrogated on other grounds*, *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024).

### III.    MOTION TO DISMISS

Despite having submitted a Motion to Dismiss, Wells Fargo – like the Plaintiffs – acknowledges that it is appropriate for this Court to stay the proceedings pending arbitration. (Doc. 20; Doc. 19 at 129; Doc. 26 at 354.) *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."). At this stage in the proceedings, the Court DENIES the Motion to Dismiss and STAYS the proceedings pending arbitration.

IT IS ORDERED:

1. Motion for Leave to Supplement the Record is GRANTED;

2. Motion to Compel Arbitration is GRANTED;

3. Motion to Dismiss is DENIED;

4. Proceeding are STAYED pending arbitration; and

5. Each six months from the date of this opinion and order, the parties are to submit a joint report on the status of the arbitration.

Dated this 28th day of March, 2025

BY THE COURT:

_____
LAWRENCE L. PIERSOL
United States District Judge